IN RE INTEREST OF JEREMY T., A CHILD UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, DOUGLAS COUNTY, APPELLEE, V. NEBRASKA
DEPARTMENT OF HEALTH AND HUMAN SERVICES, APPELLANT.

600 N.W. 2d 747

Filed September 24, 1999.    No. S-98-066.

Don Stenberg, Attorney General, Royce N. Harper, and Karen A. Anderson, Special Assistant Attorney General, for appellant.

James S. Jansen, Douglas County Attorney, and Patrick R. Guinan for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

GERRARD, J.

## NATURE OF CASE

This case presents one primary question: Should the Nebraska Department of Health and Human Services (the Department) be ordered to reimburse Douglas County for the costs of placing and caring for a particular juvenile when the separate juvenile court of Douglas County (juvenile court) issued a set of orders under one docket placing the juvenile in the custody of the Department and another order under a different docket placing the juvenile at Clarinda Academy and in the custody of the Douglas County Separate Juvenile Court Chief Probation Officer? The juvenile court answered this question in the affirmative, and the Department appeals. For the reasons that follow, we affirm the juvenile court's order, as modified.

## FACTUAL BACKGROUND

On November 23, 1994, the Douglas County Attorney's office (county attorney) filed a petition with the juvenile court, alleging that two brothers, Jeremy T. and Christopher T., were neglected juveniles pursuant to Neb. Rev. Stat. § 43-247(3)(a) (Reissue 1993). This petition created docket 90, No. 331, at the juvenile court, which will hereinafter be referred to as the "neglect docket." The juvenile court held a detention hearing on the neglect docket and ordered that both juveniles be placed into

the temporary custody of the Department for appropriate care and placement on December 8. The juvenile court found that Jeremy and Christopher were juveniles within § 43-247(3)(a) and continued the December 8 order at a pretrial hearing on December 21, a disposition hearing on February 17, 1995, and review hearings on April 17 and August 10.

On January 8, 1996, the county attorney filed another petition with the juvenile court alleging that Jeremy had committed a number of criminal acts that brought him within § 43-247(1). This petition created docket 93, No. 236, at the juvenile court, which will hereinafter be referred to as the "delinquency docket." Based on an ex parte motion for immediate custody filed by the county attorney and a letter by a case manager at the Department, the juvenile court ruled on the delinquency docket that Jeremy was a danger to himself and others as well as a flight risk. As such, the juvenile court ordered that the Douglas County sheriff detain and place Jeremy at the Douglas County Youth Center (Youth Center) on February 9.

After a simultaneous neglect docket and delinquency docket review hearing on February 23, 1996, the juvenile court reissued the delinquency docket order that Jeremy be placed at the Youth Center. Moreover, the juvenile court ordered that a previous neglect docket order of August 10, 1995 (continuing the Department's custody of Jeremy), remain "in full force and effect." On February 28, 1996, the juvenile court held a first hearing on the delinquency docket, wherein Jeremy admitted to various charges against him. The juvenile court simultaneously held a detention hearing on the neglect docket. The juvenile court ordered that Jeremy remain at the Youth Center under both the delinquency and neglect dockets.

Pursuant to the delinquency docket, the juvenile court ordered Jeremy into the custody of the Office of Juvenile Services on April 18, 1996. The juvenile court also ordered that Jeremy be transferred to the Youth Rehabilitation and Treatment Center (Rehabilitation Center) in Geneva, Nebraska, for an evaluation. Additionally, the juvenile court ordered that the cost of Jeremy's care be borne by the State of Nebraska to the extent that it is not covered by Jeremy's parent's insurance. Finally, the juvenile court ordered that Jeremy be returned to the custody of

the juvenile court when released from the Rehabilitation Center. Jeremy was released from the Rehabilitation Center and returned to the Youth Center on May 1. On May 14, the juvenile court issued an order that Jeremy remain in detention at the Youth Center and that "probation . . . make application to Clarinda Academy," located in Clarinda, Iowa.

At a hearing on the delinquency docket on June 6, 1996, the juvenile court placed Jeremy in the temporary custody of the Douglas County Separate Juvenile Court Chief Probation Officer (Douglas County CPO) and ordered Jeremy placed at the Clarinda Academy. Moreover, the juvenile court ordered that the cost of Jeremy's care and placement—to the extent that it is not covered by medicaid or another state or federal fund, or by his parent's insurance or ability to pay—be borne by the Douglas County General Assistance Fund. No representative of the Department was present at this hearing. Nevertheless, on August 23, the juvenile court issued an order on the neglect docket, with a representative from the Department present, placing Jeremy "in the temporary custody of [the Department] for continued appropriate care and placement."

On December 5, 1996, the juvenile court held a delinquency docket hearing, again with a Department caseworker present, wherein it ordered that Jeremy "remain as placed." Then, on February 25, 1997, the juvenile court again issued a neglect docket order that Jeremy "remain in the temporary custody of [the Department] for continued appropriate care and placement."

The county attorney filed a motion for support in the juvenile court against Jeremy's mother on March 31, 1997; however, the county attorney withdrew the motion to pursue a different avenue of reimbursement on May 1. On May 14, the county attorney filed another motion for support in the trial court, this time against the Department. After a delinquency docket hearing on June 5, the juvenile court ordered that Jeremy be placed on probation for 90 days, released from the Clarinda Academy on June 13, and returned to his father's home. At a hearing on the neglect docket on August 25, the juvenile court terminated the Department's custody of Jeremy.

In orders filed on December 12, 1997, the juvenile court terminated its jurisdiction over Jeremy under the delinquency

docket. Moreover, the juvenile court sustained Douglas County's motion for reimbursement and ordered the Department to pay Douglas County for the costs of Jeremy's stays at the Youth Center and the Clarinda Academy. It is from the second order that the Department timely appeals.

## ASSIGNMENTS OF ERROR

The Department asserts that the juvenile court erred in (1) finding that the Department must reimburse Douglas County for the costs of placing and caring for Jeremy, (2) failing to explicitly relieve the Department of its custodial responsibilities for Jeremy, and (3) entering an order for the specific placement of Jeremy.

In other words, the Department claims that the Nebraska Juvenile Code, Neb. Rev. Stat. ch. 43, art. 2 (Reissue 1993, Cum. Supp. 1994 & Supp. 1995) (now found at ch. 43, art. 2 (Reissue 1998)), does not allow for "dual custody," and that the juvenile court should have terminated the Department's custody over Jeremy and relieved the Department of its obligations upon placing Jeremy at the Clarinda Academy and into the custody of the Douglas County CPO.

## SCOPE OF REVIEW

■ Questions of law and statutory interpretation require an appellate court to reach a conclusion independent of the decision made by the court below. *Schmidt v. State*, 255 Neb. 551, 586 N.W.2d 148 (1998).

## ANALYSIS

As noted above, the trial court found that Jeremy was a neglected juvenile within § 43-247(3)(a) on December 21, 1994. Then, on February 9, 1996, the juvenile court adjudged Jeremy to be a juvenile under § 43-247(1). These rulings, taken together, present some confusion as to which statute controls in this matter—be it § 43-290, § 43-284, or § 43-286. Because we are aware that some of the subsections of the foregoing statutes have recently changed while the controlling text has not, we will cite to the current subsections for the sake of simplicity and con-

venience. As such, those statutes are set out here, in pertinent part, as follows:

Under § 43-247:

> The juvenile court in each county as herein provided shall have jurisdiction of:
>
> (1) Any juvenile who has committed an act . . . which would constitute a misdemeanor or an infraction under the laws of this state . . . .
>
> . . . .
>
> (3) Any juvenile (a) . . . who lacks proper parental care by reason of the fault or habits of his or her parent, guardian, or custodian; whose parent, guardian, or custodian neglects or refuses to provide proper or necessary subsistence, education, or other care necessary for the health, morals, or well-being of such juvenile; whose parent, guardian, or custodian is unable to provide or neglects or refuses to provide special care made necessary by the mental condition of the juvenile; or who is in a situation or engages in an occupation dangerous to life or limb or injurious to the health or morals of such juvenile . . . .

Next, § 43-290 states:

> *It is the purpose of this section* to promote parental responsibility and *to provide for the most equitable use and availability of public money.*
>
> Pursuant to the petition filed by the county . . . in accordance with section 43-274, whenever the care or custody of a juvenile is given by the court to someone other than his or her parent, which shall include placement with a state agency . . . the court shall make a determination of support to be paid by a parent for the juvenile . . . .
>
> . . . .
>
> *If the juvenile has been committed to the care and custody of the Department . . . , the [D]epartment shall pay the costs for the support, study, or treatment of the juvenile which are not otherwise paid by the juvenile's parent.*
>
> If no provision is otherwise made by law for the support or payment for the study or treatment of the juvenile, compensation for the study or treatment shall be paid, when

approved by an order of the court, out of a fund which shall be appropriated by the county in which the petition is filed. (Emphasis supplied.)

Moreover, § 43-284 provides:

When any juvenile is adjudged to be under subdivision (3) . . . of section 43-247, the court may permit such juvenile to remain in his or her own home subject to supervision or may make an order committing the juvenile to (1) the care of some suitable institution . . . or (6) the care and custody of [the Department].

Under subdivision (1) [*but not subdivision (6)*] of this section, *upon a determination by the court that there are no parental, private, or other public funds available* for the care, custody, education, and maintenance of a juvenile, *the court may order a reasonable sum* for the care, custody, education, and maintenance of the juvenile *to be paid out of a fund which shall be appropriated annually by the county where the petition is filed* until suitable provisions may be made for the juvenile without such payment.

(Emphasis supplied.)

Finally, § 43-286 mandates:

(1) When any juvenile is adjudicated to be a juvenile described in subdivision (1) . . . of section 43-247:

(a) The court may continue the dispositional portion of the hearing, from time to time upon such terms and conditions as the court may prescribe . . . and, subject to the further order of the court, may:

. . . .

(iii) Cause the juvenile to be placed in a suitable family home or institution, subject to the *supervision* of the probation officer. *If the court has committed the juvenile to the care and custody of the Department . . . , [then] the [D]epartment shall pay the costs of the suitable family home or institution* which are not otherwise paid by the juvenile's parents.

Under subdivision (1)(a) of this section, upon a determination by the court that there are no parental, private, or other public funds available for the care, custody, and maintenance of a juvenile, the court may order a reason-

able sum for the care, custody, and maintenance of the juvenile to be paid out of a fund which shall be appropriated annually by the county where the petition is filed until a suitable provision may be made for the juvenile without such payment.

(Emphasis supplied.)

■ Of course, statutory language is to be given its plain and ordinary meaning absent anything to the contrary; thus, an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous. *Popple v. Rose*, 254 Neb. 1, 573 N.W.2d 765 (1998).

■ The components of a series or collection of statutes pertaining to a certain subject matter may be conjunctively considered and construed to determine the intent of the Legislature so that different provisions of the act are consistent, harmonious, and sensible. *In re Invol. Dissolution of Battle Creek State Bank*, 254 Neb. 120, 575 N.W.2d 356 (1998). This court must, as far as practicable, give effect to the language of a statute and reconcile the different provisions of it so that they are consistent, harmonious, and sensible. *Hoiengs v. County of Adams*, 254 Neb. 64, 574 N.W.2d 498 (1998).

■ It is clear that the legislative intent behind the foregoing statutes—subordinate, of course, to advancing the best interests of children contemplated by the Nebraska Juvenile Code—was to "provide for the most equitable use and availability of public money." See § 43-290. See, also, § 43-246 (specifying how Nebraska Juvenile Code shall be construed). Moreover, a conjunctive reading of these statutes reveals a consistent, harmonious scheme of making the Department responsible for the costs of caring for and placing juveniles within its custody. Compare, § 43-290 (making Department responsible for such costs, and counties responsible only where no state moneys are available); § 43-284 (allowing courts to hold counties financially responsible only in situations where Department does not have custody); § 42-286 (making Department financially responsible for juveniles in its custody and allowing counties to be liable only where there are no state moneys available).

This scheme is consistent regardless of whether a juvenile is adjudged to be under § 43-247(1) or § 43-247(3)(a)—the

Department remains responsible for the costs of placing and caring for juveniles within its custody. See, § 43-290 (calling for that result when juveniles are found to be within any section of § 43-247); § 43-284 (calling for juveniles within § 43-247(3)(a) to be placed in custody of Department, and for counties to be financially responsible only in cases where juvenile is not in custody of Department); § 43-286 (calling for Department to be financially responsible for juveniles in its custody who are adjudged to be within § 43-247(1)).

The Department does not claim that state moneys are not available in the instant case. Thus, the Department can escape responsibility for the costs of placing and caring for Jeremy only during times that Jeremy was not in the custody of the Department. Indeed, the Department concedes and argues as much in assigning error to the juvenile court's failure to relieve the Department of its custodial responsibilities when it placed Jeremy in the custody of the Douglas County CPO on June 6, 1996.

■ In support of this position, the Department asserts, and Douglas County agrees, that two state agencies cannot have "dual custody" of a juvenile. The term "dual custody" is not used in any Nebraska case or statute. Because the statutes and cases do not mention, much less authorize, a "dual custody" situation, we hold that a juvenile cannot be placed in the custody of two separate agencies simultaneously. As such, the outcome of this case is determined by the effect given to the juvenile court's order awarding custody of Jeremy to the Douglas County CPO and placing Jeremy at the Clarinda Academy on June 6, 1996.

■ Section 43-286(1)(a)(iii) allows for courts to place juveniles in an "institution, subject to the *supervision* of the probation officer," or in the "*custody*" of the Department. (Emphasis supplied.) Insofar as the statute uses both terms in the same subsection, we cannot think of a reason why the Legislature would use the term "supervision" unless it meant something other than "custody." Giving statutory language its plain and ordinary meaning as we must, we determine that the term "supervision" is not synonymous with the term "custody" in § 43-286(1)(a)(iii).

The only other possible authority for placing Jeremy in the custody of the Douglas County CPO is found in §§ 43-284 and 43-285. Those statutes permit a juvenile court to award or commit a juvenile to the "care" of the Department, an association, a suitable institution, or an individual. However, the terms "association," "institution," and "individual" are not defined in the statutes. Hence, it is difficult to know whether the office of the Douglas County CPO would qualify as an individual, an institution, or an association.

Still, we note that those statues delineate between the terms "care" and "custody." See, § 43-285 (permitting those individuals or associations with "care" of juvenile to acquire "guardianship" of juvenile); § 43-284 (allowing for juveniles to be placed in *"care"* of suitable institution or family, reputable citizen, association, or *"care and custody"* of Department (emphasis supplied)). Thus, we conclude that the juvenile court lacked statutory authority to place Jeremy in the custody of the Douglas County CPO.

The Department, however, did not perfect a timely appeal from the June 6, 1996, order, nor can that order be collaterally attacked in the present appeal. The error committed by the trial court was an error in the exercise of jurisdiction, but it was not outside the subject matter jurisdiction of the court. See, *Mayfield v. Hartmann*, 221 Neb. 122, 375 N.W.2d 146 (1985); *Schilke v. School Dist. No. 107*, 207 Neb. 448, 299 N.W.2d 527 (1980) (distinguishing between want of jurisdiction and error in exercise of jurisdiction).

Jurisdiction of the subject matter means the authority to hear and determine both the class of actions to which the action before the court belongs and the particular question which it assumes to decide. *In re Interest of J.T.B. and H.J.T.*, 245 Neb. 624, 514 N.W.2d 635 (1994). The trial court in the instant case was authorized to hear the class of actions of the action before the court—juvenile dispositions—and to decide the particular question assumed—the custody of Jeremy. As jurisdiction in the trial court had properly attached, the June 6, 1996, order placing custody in the Douglas County CPO was in error, but it is not void. See *Mayfield v. Hartmann, supra* (judgments valid and

binding for all purposes where jurisdiction has once attached). Custody of Jeremy was removed from the Department on June 6.

The result of our holding is that the Department is not responsible for the costs of caring for Jeremy from June 6 through August 23, 1996. See, *In re Interest of Todd T.*, 249 Neb. 738, 545 N.W.2d 711 (1996) (holding that Department cannot be held responsible for costs when juvenile is not in custody of Department); *In re Interest of G.B., M.B., and T.B.*, 227 Neb. 512, 418 N.W.2d 258 (1988) (explaining that county in which petition was filed is responsible for costs of care and placement of juvenile when juvenile court orders specific placement of juvenile). However, that holding does not extend to periods after the juvenile court's order on August 23, wherein Jeremy was placed back into the custody of the Department while he remained at the Clarinda Academy.

A Department representative assigned to Jeremy's case was present on August 23, 1996, when the juvenile court placed Jeremy in the Department's custody. The Department could have discovered immediately that Jeremy had been placed and was located at the Clarinda Academy. If the Department thought that simultaneously placing Jeremy at the Clarinda Academy and in the Department's custody was inappropriate or unauthorized, it could have appealed that order to a juvenile review panel or to an appellate court. See, §§ 43-287.01 through 43-287.06 (setting forth expedited review procedure for juvenile court placement orders that differ from plan prepared by Department); § 43-2,106.01 (stating that Department may appeal any final order or judgment entered by juvenile court to courts of appeals). Compare, *In re Interest of R.G.*, 238 Neb. 405, 470 N.W.2d 780 (1991) (holding that order determining where juvenile will be placed is dispositional order), *disapproved on other grounds, O'Connor v. Kaufman*, 255 Neb. 120, 582 N.W.2d 350 (1998); *In re Interest of R.A. and V.A.*, 225 Neb. 157, 403 N.W.2d 357 (1987) (holding that dispositional orders are final and appealable orders), *overruled on other grounds, State v. Jacob*, 242 Neb. 176, 494 N.W.2d 109 (1993).

The Department chose not to appeal the August 23, 1996, order, which was repeated on December 6, 1996, and again on February 25, 1997. Instead, the Department

appealed only the order entered on December 12, 1997 (sustaining Douglas County's motion for reimbursement). By not appealing from such final orders of the juvenile court, the Department waived the grounds for bringing such an appeal. See, *In re Interest of C.D.C.*, 235 Neb. 496, 455 N.W.2d 801 (1990); *In re Interest of L.B., A.B., and A.T.*, 235 Neb. 134, 454 N.W.2d 285 (1990); *In re Interest of M.B. and J.B.*, 233 Neb. 368, 445 N.W.2d 618 (1989).

## CONCLUSION

In sum, while the trial court erred in placing custody of Jeremy with the Douglas County CPO in its order of June 6, 1996, such error was not jurisdictional and was waived by the failure to prosecute a timely appeal. Consequently, we modify the juvenile court's order of December 12, 1997, inasmuch as we relieve the Department of responsibility for the costs of placing and caring for Jeremy between June 6 and August 23, 1996. In all other respects, we affirm the December 12, 1997, judgment insofar as it holds the Department responsible for such costs at all other times.

AFFIRMED AS MODIFIED.