REQUESTED BY: Shane Osborn
State Treasurer
You have requested our opinion regarding two questions relating to the Nebraska State Treasurer, the University of Nebraska, and the state purchasing card program as established in Neb. Rev. Stat. § 81-118.02 (2008). You have posed the following questions:
 (1) Is the purchasing card contract considered a banking relationship under the authority of the State Treasurer? and
 (2) As a state agency, is the University of Nebraska required to participate in the State Treasurer negotiated Purchasing Card Contract per Neb. Rev. Stat. § 81-118.02?
Neb. Rev. Stat. § 81-118.02 states, in pertinent part, that "(2) Any state official, state agency, or political subdivision may utilize the state purchasing card program for the purchase of goods and services for and on behalf of the State of *Page 2 
Nebraska." The State Treasurer and the Director of the Nebraska Department of Administrative Services are charged with the duty to determine the type of purchasing card or cards to utilize in the state purchasing card program. Neb. Rev. Stat. § 81-118.02 (1). The State Treasurer is authorized to contract with one or more third-parties to operate the purchasing card program on behalf of the state. Id. No other state agency or entity is authorized to enter into such contracts.
From conversations with your office, your letter, and the statute, we understand that that there is one master or umbrella contract entered into by the State Treasurer with a third party banking institution for the purpose of operating purchasing card programs. Under that contract, there may be more than one purchasing card program administered and maintained by state agencies. But, each program must conform to the terms of the master contract, and each program must be established through the banking institution with which the State Treasurer has contracted. Agencies are not permitted to negotiate or enter into their own separate banking contracts outside the master contract.
For the reasons set forth below, we conclude that the purchasing card contract is a "banking relationship" under the authority of the State Treasurer. We also conclude that the University of Nebraska is required to participate in the State Treasurer negotiated Purchasing Card Contract per Neb. Rev. Stat. § 81-118.02. From your letter, we understand that you concede that the University of Nebraska can develop and maintain their own purchasing card program, as long as it is within the terms and conditions of the master contract negotiated by the State Treasurer.
The questions you have posed to us are nearly identical to those posed in relationship to 1997 Neb. Laws LB 70 and discussed in Op. Att'y Gen. No. 98006 (January 21, 1998). The only difference is that the program analyzed in that opinion was the authorization of governmental subdivisions and state agencies to accept credit card payments as cash payments in certain instances. See, Neb. Rev. Stat. § 81-118.01 (1), Op. Att'y Gen. No. 98006. We will quote extensively from that opinion, as the same analysis applies to the questions raised by you with respect to Neb. Rev. Stat. § 81-118.02.
The Purchasing Card Contract is a Banking Relationship
Your first question is whether the purchasing card contract is considered a banking relationship under the authority of the State Treasurer. We believe it is. *Page 3 
 This office has indicated in previous opinions that constitutional officers such as the State Treasurer have certain core functions and inherent constitutional authority which cannot be removed by legislative enactment. Op. Att'y Gen. No. 93012 (March 4, 1993); 1969-70 Rep. Att'y Gen. 164 (Opinion No. 110, dated May 5, 1970). Our research discloses that, since the inception of statehood in Nebraska, the State Treasurer has had the duty to receive and keep all money of the State not expressly required to be received and kept by some other officer. Neb, Rev. Stat. § 84-602 (1) (1994); Neb. Rev. Stat. 1866, c. 4, § 18. Moreover, since 1891, the State Treasurer has had authority to deposit the funds of the state in his keeping in state and national banks. Neb. Rev. Stat. § 77-2301 (1996), 1891 Neb. Laws, c. 50, § 1, p. 347. it is also generally accepted that the Treasurer of a state has, by law, the custody of the monies of the State. 81A C.J.S. States § 135. Based upon those historical duties of the State Treasurer, it seems to us that the core functions of that office would clearly include maintaining custody of state funds. Arguably, those core functions would also include general supervision of state's relationships with state and national banks.
Op. Att'y Gen. No. 98006, 7-8. As Neb. Rev. Stat. § 81-118.02(1) charges the State Treasurer with the duty to contract with "one or more financial institutions, card-issuing banks, credit card companies, charge card companies, debit card companies, or third-party merchant banks capable of operating the state purchasing card program," we see no reason why this would not be a "banking relationship." Therefore, it is our conclusion that the purchasing card contract codified in Neb. Rev. Stat. § 81-118.02 is a banking relationship.
The Purchasing Card Contract and the University ofNebraska
Your second question is whether "as a state agency, is the University of Nebraska required to participate in the State Treasurer negotiated Purchasing Card Contract per Neb. Rev. Stat. § 81-118.02?"
As with your first question, the analysis in Op. Att'y Gen. No. 98006 is equally relevant to your second query.
In Op. Att'y Gen. No. 98006, after a detailed analysis, this office stated that "it appears to us that the University is a "state agency" which would fall under the language" of § 81-118.01. That same analysis and conclusion applies here to Neb. Rev. Stat. § 81-118.02. That opinion went on to state, after a lengthy discussion of Board of Regents ofthe University of Nebraska v. Exon, 199 Neb. 146, *Page 4 256 N.W.2d 330 (1977) and whether the University was required to comply with § 81-118.01:
 As a result, it seems to us that statutes which pertain generally to state agencies and which do not purport to direct the Board of Regents as to matters which are central to the University's educational function or its "government," can have application to the University, even under Exon. To some extent, examples of such statutes include those described in University Police Officers Union, International Brotherhood of Police Officers, Local 567 v. University of Nebraska, 203 Neb. 4, 277 N.W.2d 529 (1979) in which the Court stated that the University is subject to actions before the Court of industrial Relations, to the Nebraska Workmen's Compensation Law and the Nebraska Employment Securities Law. In a similar fashion, we do not believe that subjecting the University to the general state credit card arrangements made by the State Treasurer for all state agencies intrudes, in any significant sense, in the University's educational function or its "government." For that reason, we believe that LB 70 is acceptable under the Exon decision.
 We also believe that the decision in the Exon case does not invalidate the requirements of LB 70 for another reason. In the University Police Officers case, supra, the Court pointed out that art. VII, § 10 of the Nebraska Constitution must be read in connection with the other provisions of the Nebraska Constitution. In that regard, the office of the Nebraska State Treasurer has existed as a constitutional and Executive Branch office since the first Nebraska Constitution was approved by the people of the state in 1866. Neb. Const. of 1866, art. Ill, § 1 (1867). Therefore, the authority of the University Board of Regents under art. VII, § 10 of the Nebraska Constitution must be considered in light of art. IV, § 1 and the fact that the Nebraska Constitution also contemplates the existence of and duties for the office of State Treasurer.
 ***
 Since art. VII, § 10 of the Nebraska Constitution must be read together with art. IV, § 1, and since the core functions of the State Treasurer seem to include those matters enumerated above, we believe that the general government of the University vested in the Board of Regents under the Nebraska Constitution may only be exercised in such a way as to preserve the Treasurer's general authority over the custody of state funds and the supervision of the state's relationships with state and national banks. Therefore, the credit card provisions of LB 70 appear acceptable *Page 5 
under the Exon case because they involve the Treasurer's general supervision of matters related to the state's business with banks. On the other hand, it remains clear under Exon that the Treasurer's authority with respect to state funds and general supervision of the state's relationships with banks cannot be used to intrude upon the authority of Board of Regents in the general government of the University.
Op. Att'y Gen. No. 98006, 6-8. For the full analysis under theExon decision, we would direct your attention to page four through eight of that opinion, under the heading Question 1. The only modification to that analysis needed in order to apply it to the instant scenario is the substitution of "LB 113" for "LB 70."
In addition, we have examined the Legislative History of 1999 Neb. Laws LB 113 ("LB 113"), which has been codified as Neb. Rev. Stat. § 81-118.02 to determine if that history supports this same conclusion. We also reviewed the Legislative History of 2000 Neb. Laws LB 1216 ("LB 1216"), as you have indicated that Neb. Rev. Stat. § 81-1110.06 (2008) is also applicable to the purchasing card program.
The language in statutes should be given its plain and ordinary meaning. In re: Interest of Jeremy T., State of Nebraska, DouglasCounty v. Nebraska Department of Health and Human Services,257 Neb. 736, 600 N.W.2d 747 (1999). In the event that a statute is ambiguous, the legislative history of the act is examined for the main intent of the Legislature in enacting the statute. State ex rel.Bouc v. School Dist. of City of Lincoln,211 Neb. 731, 320 N.W.2d 472 (1982).
The language in Neb. Rev. Stat. § 81-118.02 as to the purchasing card program is very similar to the language found in § 81-118.01 authorizing state agencies to accept credit cards. This similarity was purposeful. The testimony of bill proponent David Heineman, who at that time was the Nebraska State Treasurer, indicates that Neb. Rev. Stat. § 81-118.02 was intended to be patterned after § 81-118.01. Committee Records on LB 113, 96th Neb.Leg., 1st
Sess. 14 (January 20, 1999). The Legislative History also indicates that while an agency would not be required under § 81-118.02 to make use of purchasing cards, that if an agency chose to do so, it would utilize the program established under § 81-118.02. Id. at 12-13. In addition, committee testimony confirmed that the University was participating in the program established under § 81-118.01, and was intended to participate in the purchasing card contract under § 81-118.02. Id. at 14, 19. *Page 6 
Neb. Rev. Stat. § 81-1110.06 addresses rebates received by state agencies through their participation in the purchasing card program and requires rebates to be credited to the State Purchasing Card Distributive Fund, "except for rebates received from separate purchasing card programs entered into solely by the University of Nebraska." These rebates would be used to cover the expenses of the Nebraska Department of Administrative services of administering the various purchasing card programs. Any rebates remaining after expenses are deducted are to be distributed to the University, DAS Accounting on behalf of all other state agencies, and any political subdivisions participating in the state's purchasing card program. Neb. Rev. Stat. § 81-1110,06. The plain language of this portion of the statue, particularly when read in conjunction with Neb. Rev. Stat. § 81-118.02 and Op. Att'y Gen. No. 98006, would indicate that the Legislature intended for the University to participate in the state's purchasing card contract.
We believe that the "separate purchasing card programs entered into solely by the University of Nebraska" refer to those programs you have indicated to us that the University may develop and operate under the master contract negotiated and entered into by the State Treasurer. The University may not enter into a separate contract or maintain a separate banking relationship outside of this master contract.
 Conclusion
For the reasons set forth herein, we conclude that the purchasing card contract is a "banking relationship" under the authority of the State Treasurer, and the University of Nebraska is required to participate in the State Treasurer negotiated purchasing card contract. The University of Nebraska may, however, develop and operate its own purchasing card program under the umbrella of this State Treasurer negotiated and authorized master contract and retain any rebates earned through this separate purchasing card program.
Sincerely,
 JON BRUNING Attorney General
 Natalee J. Hart Assistant Attorney General *Page 7 
Approved:
 _____________________ Attorney General *Page 1